# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DOMNICK MICHAEL DORIA,      )
      Petitioner,         )
                              )

v.                            )      **Case No. 3:19-cv-00562**
                              )      **Judge Richardson/Frensley**

GRADY PERRY,           )
      Respondent.     )

## REPORT AND RECOMMENDATION

Petitioner Domnick Michael Doria was convicted by a jury on August 28, 2013, of four counts of Class B felony sexual exploitation of a minor, eleven counts of the lesser-included offense of Class C felony sexual exploitation of a minor for possessing more than fifty images or materials, and twenty-four counts of the lesser-included Class D felony sexual exploitation of a minor for possessing fifty or less images or materials. *Tennessee v. Doria*, No. M2014-01318-CCA-R3-CD, 2016 WL 1694120, at *15 (Tenn. Crim. App. Apr. 26, 2016); *perm. app. denied* (Tenn. Aug. 17, 2016); Docket No. 1, p. 2. On April 26, 2016, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and sentences. *Doria*, 2016 WL 1694120, at *1. In January 2017, Petitioner timely filed requests for post-conviction relief, which were denied by the Montgomery County Circuit Court on September 12, 2017. Docket No. 7-1, pp. 4-9, 12-23. The Tennessee Court of Criminal Appeals affirmed the denial. *Doria v. Tennessee*, No. M2017-02024-CCA-R3-PC, 2018 WL 6528695, at *1 (Tenn. Crim. App. Dec. 12, 2018); *perm. appeal denied* (Tenn. Feb. 21, 2019).

Having sought relief in state courts, Petitioner now brings his claims to federal court under 28 U.S.C. §§ 2241 and 2254, alleging that errors committed in his state proceedings violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States

Constitution. Docket No. 1, pp. 1, 4-8.

The Court finds that an evidentiary hearing is unnecessary to resolve the issues asserted in the petition. Because Petitioner has not shown that the state court's adjudication of Petitioner's claim can be construed as contrary to or an unreasonable application of clearly established federal law on several of his claims, and because Petitioner has not exhausted all available state remedies for one of his claims, the undersigned recommends that habeas corpus relief be **DENIED.**

## I.    BACKGROUND

In deciding Petitioner's appeal from his conviction, the Tennessee Court of Criminal Appeals summarized the factual background of this case:

> Investigator Mike Cereceres, of the Montgomery County Sheriff's Office, testified that on July 11, 2011, he executed a search warrant at 3864 Northeast Drive, Apartment B, in Clarksville. The affidavit in support of the search warrant was admitted as an exhibit to the hearing without objection. The affidavit included information describing Cereceres' background as an investigator assigned to the Internet Crimes Against Children ("ICAC") Task Force. The affidavit indicated that Cereceres is "a Certified Computer Forensic Examiner" with the sheriff's office. Investigator Cereceres testified that the designation was an error, and he was not certified although he had attended a training course. In preparing the affidavit, Investigator Cereceres used a template that already contained boilerplate language that the affiant was a certified computer forensic examiner. He testified that he had previously removed that language in preparing affidavits for other search warrants, but he inadvertently left the incorrect statement of credentials in the affidavit he prepared in this case. Investigator Cereceres testified that his "purpose [wa]s not to be deceitful." He testified, "I have done way too many cases, there is no need to lie."

> …

> Investigator Cereceres arrived at Defendant's residence to execute the search warrant at 5:20 a.m. Investigator Cereceres and another officer were both armed. Defendant shared the apartment with two roommates who were present when Investigator Cereceres arrived, but Defendant had already left to go to work. Investigator Cereceres asked the roommates to contact Defendant. Investigator Cereceres

2

explained that he "like[s] to have everyone there, whosoever room that is, [he] would like them to be there during execution to obtain statements." One of the roommates called Defendant, and Defendant arrived shortly thereafter.

By the time Defendant returned to the apartment, all of the rooms containing a computer had been searched except for Defendant's room. Investigator Cereceres spoke to Defendant and told him his purpose for being there. Investigator Cereceres showed Defendant the search warrant. Investigator Cereceres asked Defendant if he had a computer, and Defendant responded that there was a computer in his bedroom. Investigator Cereceres testified that he advised Defendant of his Miranda rights and that Defendant read and signed a waiver of rights form. Investigator Cereceres did not make an audio or video recording of Defendant being advised of his rights. Investigator Cereceres asked Defendant questions which he wrote on the back of the waiver of rights form, and Defendant wrote his answers. Investigator Cereceres asked Defendant if he used "peer-to-peer" software. Investigator Cereceres testified that Defendant did not attempt to leave the interview.

Defendant testified that a search warrant was executed at his apartment on July 11, 2011. At the time of the search, Defendant was a sergeant in the infantry at Fort Campbell. On the morning of the search, Defendant left his apartment at 4:30 a.m. to report for work at 5:00 a.m. Defendant had passed through the security gates at Fort Campbell when he received a phone call from his roommate Paul Nacin advising him that the police were at the apartment. Defendant immediately informed his platoon sergeant that he would be late for work, and Defendant returned to the apartment.

When Defendant arrived at the apartment, he was met by Investigator Cereceres and another officer who was armed. Mr. Nacin and Mr. Porter were also in the apartment. Defendant could not recall whether Investigator Cereceres was armed, but he testified that he was wearing a bullet-proof vest. Defendant testified that Investigator Cereceres advised him not to talk to his roommates. Defendant testified,

> The questioning came about, we came in my room, said is that your computer? I said yes. We sat down on the bed and he also looked around and I opened the closet for him, to show him I had no other objects, storing device of computer images. And then he asked me if I had people-to-people sharing network and I informed him yes and then before the

3

questioning went on any further, he said hold on, let me write these down and then you can answer them.

Defendant testified that Investigator Cereceres did not advise him of his Miranda rights. He testified that he would not have answered Investigator Cereceres' questions if he had been advised of his rights. Defendant expressed concern about losing his rank of sergeant, and Investigator Cereceres told Defendant, "I'll make sure that when everything does happen, the Army takes it easy on you." Defendant testified, "I figured I would cooperate as best I possibly could and answered every question he gave me."

Defendant testified that after he answered all of Investigator Cereceres' written questions, Investigator Cereceres told him to "flip [the form] to the back" and sign and date it, "stating that everything [Defendant] answered was to the best of [his] knowledge and as truthful as possible." Defendant testified that he did not read over the form. Defendant wrote the time as 5:29 a.m.

The back of the form reads as follows:

> I Domnick Doria have lime wire and frost wire and have download[ed] P2P networking on my computer along with songs and have accidently [*sic*] downloaded other things[.] I also do searches of taboo materials and strange fetishes such as moms / incest / pee / [b]eastiality [*sic*] / tranny / shemale / sons / [b]rother,sister
>
> 1) Did you install the P2P network programs?
> A – yes I am [*sic*]
>
> 2) Have you ever searched for child pornography?
> A – no I have not
>
> 3) Will I find child sex abuse images on this computer owned by you[?]
> A – yes by accident
>
> 4) What have you accidentally downloaded[?]
> A – There are images of mothers with there [*sic*] kids
>
> 5) Around how many images will I find of child sex abuse, will I find on you[r] computer?
> A – approximately 25

4

Defendant testified that he signed the document and noted "0529" as the time. Defendant denied that he wrote "6:03" on the front page of his statement. He testified that he always wrote the time in military time. Defendant testified that he arrived at Fort Campbell at "4:50ish" and returned to the apartment between 5:20 and 5:25. Defendant estimated that it took him approximately 15 to 20 minutes to commute between work and home.

Defendant testified that he would not have made a statement to Investigator Cereceres if he had been advised of his rights. He also testified that if he had known that Investigator Cereceres lacked any leverage with the Army, he would not have answered his questions. Defendant testified that he did not feel free to leave and believed that he would be arrested if he attempted to leave. Defendant testified that he believed "it was mandatory to be there" during the execution of a search warrant.

…

Investigator Cereceres testified that other residents in the apartment had access to Defendant's computer. He testified that Defendant's roommates, Mr. Nacin and Mr. Porter, each had their own computer and all of them were connected to the same IP address, however, Defendant's computer had the globally unique identification number ("GUIN") of the file-sharing software. Neither of Defendant's roommates' computers contained peer-to-peer software. Investigator Cereceres conducted a cursory review of those computers and found no evidence of downloaded child pornography. Investigator Cereceres retrieved Defendant's computer and turned it over to Scott Levasseur for forensic examination. In order to preserve evidence, Investigator Cereceres did not conduct a cursory review of Defendant's computer. Defendant's statement was admitted as evidence and read to the jury.

Paul Nacin testified that he served with Defendant in the Army. Mr. Nacin and Defendant were both deployed to Afghanistan in 2011. They became roommates when Mr. Nacin returned from Afghanistan in April, 2011. Mr. Nacin testified that he had never used Defendant's computer and that he had never observed Defendant looking at child pornography on Defendant's computer.

Andrew Porter was also roommates with Defendant and served with Defendant in Afghanistan. Mr. Porter was present at the time the search warrant was executed. Mr. Porter testified that he never used Defendant's computer and that he never saw anyone else use

Defendant's computer. Mr. Porter testified that he never observed Defendant looking at pornographic images on his computer.

Scott Levasseur, a detective with the Dickson County Sheriff's Office, was assigned to the F.B.I. Task Force in Nashville to investigate internet crimes against children. Detective Levasseur was tendered as an expert in computer forensic examinations and peer-to-peer child pornography examination without objection by Defendant. Detective Levasseur conducted a forensic examination of Defendant's computer at the request of the Montgomery County Sheriff's Office. Detective Levasseur made an exact copy of the computer hard drive. His examination revealed that the computer was registered to Defendant. Detective Levasseur located more than 4,000 images and 61 video files of child pornography on Defendant's computer in both "live" and "deleted" formats. He explained that "live" files are available for any user to open and view, and "deleted" files are files that have been deleted and placed in the recycle bin where they remain until the contents of the recycle bin are deleted. Detective Levasseur provided the dates in May, 2011 through July, 2011, on which the files were downloaded onto the computer.

Detective Levasseur testified that he found no "other user activity except for the defendant[.]" He testified that it was his opinion, based on Defendant's statement and his examination of Defendant's computer, that Defendant was the individual who downloaded the images onto the computer. He testified, "Yes, sir, I have no doubt [Defendant] is responsible for it." Detective Levasseur testified that it was "fairly easy" to associate the child pornography downloads with a particular user. He testified, "all of the accounts, internet account history, pictures, stuff like that, all belonged . . . they were of the defendant[.]" Detective Levasseur observed activity on Facebook and Skype, and both accounts belonged to Defendant. He identified another user on the laptop by the name and profile of "Jennifer Relsarro." Detective Levasseur attempted to locate "Jennifer Relsarro" by searching every police database and was unsuccessful. He testified that there were no women living in Clarksville by that name. He conducted "a reverse picture look up on the internet" and found the photograph appeared on over 200 websites, and it was originally created in an amateur pornographic site. Detective Levasseur testified that "it is not unusual for people on the internet to pose – as males posing as females, and vice versa so – but I was able to in fact, confirm that this woman doesn't live in Clarksville and that is made up, this profile is made up." The profile "Jennifer Relsarro" was using Yahoo Instant Messenger to access and download child pornography.

Detective Levasseur testified that, in his opinion, "Jennifer Relsarro" was a user account created by Defendant and "used by the Defendant to download child pornography from other users on the internet." He testified:

> The interesting fact with her use on instant messenger and the defendant's use, they coincide with each other. You have her logged in requesting specific types of child pornography files from users out there in cyberspace and then you have her logging off instant messenger and within one minute, the defendant's account, Dom Doria 13 gets logged in. So that gets me digging deeper and looking at the access of this account with other accounts and I am able to see that every time this account is used, other accounts belonging to the defendant are used just before or just after or during, when this person is logged in. So – it is pretty obvious that it is the same person.

Detective Levasseur's examination of Defendant's computer revealed an instance where Defendant was playing an online game using an account or profile identified with him at the same time that a child pornography file was being accessed or downloaded. Detective Levasseur also conducted a search to determine whether Defendant's roommates had used his computer and found no information that anyone besides Defendant had used the computer, with the exception of "one small [S]kype fragment that [he] was able to get out," which was a communication between Andrew Porter and his girlfriend. Detective Levasseur testified that there were "about ninety child pornography images" in the "download folder" on Defendant's computer. He testified that "mixed in with those child pornography files are some images of the Defendant in his Army uniform, he looked like he was on deployment[.]" Detective Levasseur found "a total of sixty-six pornographic video files. Thirty-four of those were child pornography and we are talking live files . . . and then fourteen of them were of adult porn[.]" Detective Levasseur explained that "frostwire is a peer-to-peer file sharing program." He explained that users input search terms to locate specific files. Users of the file sharing program are connected from "all over the world." Detective Levasseur also found "six pages" of partially downloaded files containing pornographic images and videos of children in the "incomplete" folder on Defendant's computer. Detective Levasseur noted several occasions when child pornography files were downloaded onto Defendant's computer

7

while Defendant was logged in using his username or profile. Detective Levasseur found no evidence that a virus or malware downloaded child pornography onto Defendant's computer. Defendant testified that the computer taken from his apartment examined by Detective Levasseur belonged to him. He testified that his mother sent him the laptop while he was deployed in Afghanistan to "just watch movies and play music in [his] down time." He also used his computer to communicate with his family. Defendant testified that "only a select few guys" had computers there, and he often allowed other soldiers to use his computer. Defendant was surprised that Detective Levasseur did not find any chat fragments from other soldiers on his computer. Defendant testified that his account passwords were saved on his computer, and other people could access his accounts while using his computer. He testified that he did not monitor other soldiers' use of his computer. Defendant testified that soldiers used flash drives or external hard drives to download files from each others' computers. Defendant returned from Afghanistan in April, 2011, and moved into an apartment he shared with Andrew Porter and Paul Nacin. Defendant testified that he did not keep his bedroom door locked and that he kept his computer either in his bedroom or in the living room. Defendant testified that in the first "couple of weeks that we were first back [from Afghanistan], we had a lot of people at the house." Defendant testified that both of his roommates had their own computers. Defendant testified that he downloaded Frostwire to download music and movies. He acknowledged that he gave a written statement to the police. Defendant added that he searched certain terms "to find role playing material." Defendant denied that he searched terms to download child pornography. Defendant testified that he downloaded child pornography by accident, and he attempted to delete it. Defendant added that he had no specialized computer training. Defendant testified that on the night before the search warrant was executed, he and his two roommates were the only people present in the apartment. He testified that he stayed up late playing his X-Box. Defendant was unaware of anyone having access to his computer that evening. Defendant denied that he downloaded child pornography that evening.

Docket. No. 6-24, pp. 2-8.

## II.    PROCEDURAL HISTORY

On April 2, 2012, a grand jury indicted Petitioner on thirty-nine counts of sexual exploitation of a minor.  Docket No. 6-1, pp. 4-13.  Defendant thereafter filed a Motion to Suppress

Fruits of Invalid Search Warrant and a Motion to Suppress Involuntary Statements, both of which received hearings and were ultimately denied by the trial court on October 5, 2012. *Id.* at 14, 58, 147; Docket No. 6-5.

Following a jury trial in 2013, Petitioner was convicted of four counts of felony sexual exploitation of a minor, eleven counts of felony sexual exploitation of a minor for possessing more than fifty images or materials, and twenty-four counts of felony sexual exploitation of a minor for possessing fifty or less images or materials. Docket No. 1, p. 2. Petitioner was sentenced to effectively thirteen years of confinement.[1] Docket No. 6-6, p. 44. Petitioner then timely filed an appeal as of right to the Tennessee Court of Criminal Appeals. Docket No. 6-16.

In his brief to the Tennessee Court of Criminal Appeals, Petitioner raised six issues for review. Docket No. 6-22, pp. 2-3. First, Petitioner argued the trial court erred by denying his Motion to Suppress Fruits of Invalid Search Warrant and Motion to Suppress Involuntary Statements. *Id.* at 20. Second, Petitioner claimed the evidence presented at trial was insufficient to support his conviction. *Id.* at 42. Third, Petitioner argued the trial court improperly admitted hearsay testimony through Investigator Cereceres. *Id.* at 47. Fourth, Petitioner claimed the trial court improperly admitted irrelevant evidence of pornographic video files depicting bestiality. *Id.* at 53. Fifth, Petitioner asserted his convictions violated the double jeopardy clause. *Id.* at 27-58. Finally, Petitioner contended the trial court abused its discretion by imposing partial consecutive sentencing. *Id.* at 62. The Tennessee Court of Criminal Appeals issued a decision on April 26, 2016, affirming the trial court's judgments on all six claims. Docket No. 6-25. Petitioner filed an application for discretionary review by the Tennessee Supreme Court on June 10, 2016 (Docket No. 6-26), but his application was denied August 27, 2016. Docket No. 6-27.

---

[1] Petitioner was sentenced to serve three years for his Count C and four years for his Count D charges concurrently and nine years consecutively for his Count B charges. Docket No. 6-6, p. 44.

Petitioner began seeking post-conviction relief in 2017. Docket No. 7-1, p. 8. On January 23, 2017, Petitioner filed a petition for post-conviction relief with the Montgomery County Circuit Court claiming denial of effective assistance of counsel during pretrial and at trial. *Id.* at 6. The Montgomery County Circuit Court granted Petitioner a hearing that was held on August 15, 2017. *Id.* at 12. On September 12, 2017, the Montgomery County Circuit Court issued an order denying Petitioner post-conviction relief on September 12, 2017. *Id.* Petitioner then filed an appeal to the Court of Criminal Appeals who affirmed the denial on December 12, 2018. Docket Nos. 7-7, 7-9, 7-11. The Tennessee Supreme Court denied Petitioner's application for permission to appeal on February 21, 2019. Docket No. 7-14.

Petitioner comes now before this Court with a Petition for a Writ of Habeas Corpus filed on July 3, 2019. Docket No. 1, p. 1. Petitioner alleges within that the judgments and sentences imposed upon him resulting in his custody were imposed in violation of the United States Constitution. Specifically, Petitioner claims that: (1) Investigator Cereceres, working on behalf of the Montgomery County Sheriff's Office, submitted an affidavit in support of a search warrant containing a false statement, making the search warrant he obtained invalid and the resulting search a violation of Petitioner's Fourth and Fourteenth Amendment rights; (2) the Investigator testified to statements from Petitioner obtained in violation of his Fifth and Fourteenth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); (3) the trial court improperly admitted hearsay statements in violation of Petitioner's rights under the Sixth and Fourteenth Amendments pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004); (4) the trial court improperly admitted unfairly prejudicial evidence contained in a witness' supplemental report which violated his Fifth, Sixth, and Fourteenth Amendment rights under *O'Neal v. McAninch*, 513 U.S. 432 (1995); and (5) Petitioner did not receive effective assistance of counsel during either pretrial or trial in violation

10

of his Sixth and Fourteenth Amendment rights.  Docket No. 1, pp. 4-8.

Respondents filed an answer on March 12, 2020.  Docket No. 8.  Petitioner filed a Reply on April 30, 2020.  Docket No. 13.  Petitioner's remaining[2] requests for relief are as follows: Petitioner seeks discharge from custody until and unless he is retried and re-sentenced within a reasonable period of time and requests that the Court vacate his convictions and sentences, grant any requested discovery or process needed for the investigation and full presentation of his claims of constitutional error, and conduct several evidentiary hearings[3] on his claims of constitutional deprivation.  Docket No. 1, p. 10.

### III.  STANDARD OF REVIEW

A state prisoner can petition a federal court for relief of a state court conviction by applying for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.  Exhaustion Requirement

For a petition for a writ of habeas corpus to be granted, it must appear that: "the applicant has exhausted the remedies available in the courts of the State;" "there is an absence of available State corrective process;" or "circumstances exist that render such process ineffective to protect the rights of the applicant." § 2254(b)(1)(A)-(B).  The exhaustion requirement ensures state courts have "an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  To meet that requirement,

---

[2] Petitioner's request for the Court to order Respondent, Grady Perry, to respond is moot because Respondent has filed an Answer to Petitioner's Petition.  Docket No. 1, p. 10; Docket No. 8.
[3] Petitioner's Petition for Writ of Habeas Corpus requests an evidentiary hearing on the issue of the misrepresentation in Investigator Cereceres' affidavit.  Docket No. 1, p. 4.  In Petitioner's Reply to Respondent's Answer, Petitioner adds the following issues require an evidentiary hearing: whether Petitioner was in custody at the time he made statements to Investigator Cereceres, whether Petitioner was properly advised of his *Miranda* rights, and the effectiveness of Petitioner's trial and pretrial counsel.  Docket No. 13, p. 2, 4.

the state prisoner seeking relief must raise the claims in the available state courts,[4] *Rose v. Lundy*, 455 U.S. 509, 520 (1982), and his claims must "be presented to [those] courts 'under the same theory in which it is later presented in federal court.'" *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (citing *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987)). Though, "when [a] prisoner fails to fully and fairly present his claims to the state courts before the time for him to do so has expired, he procedurally defaults and is foreclosed from federal habeas review of those claims, absent a showing of cause and prejudice or a fundamental miscarriage of justice." *In re Cook*, 215 F.3d 606, 608 (6th Cir. 2000) (citing *O'Sullivan*, 526 U.S. 838 (1999); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977)).

## B. Standard of Review for Fully Exhausted Claims

Two circumstances allow a federal court to grant habeas corpus relief to a state prisoner seeking an application for a writ on fully exhausted claims. *See* 28 U.S.C. § 2254 (d)(1)-(2). The first circumstance is when "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). "A state court's adjudication of a claim is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.'" *Stojetz v. Ishee*, 892 F.3d 175, 192 (6th Cir. 2018), *cert. denied sub nom. Stojetz v. Shoop*, 138 S.Ct. 1262 (2019) (quoting *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014)). Also, "a state court's decision

---

[4] For claims arising from state criminal proceedings in Tennessee, the exhaustion requirement is met when the Tennessee Court of Criminal Appeals has reviewed the asserted claims of error on the merits. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003).

12

involves an 'unreasonable application' of federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.'" *Id.* (quoting *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007)). "'Clearly established federal law' includes only the holdings of the Supreme Court, excluding any dicta; and an application of these holdings is 'unreasonable' only if the petitioner shows that the state court's ruling 'was so lacking in justification that there was error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Id.* (quoting *White v. Woodall*, 572 U.S. 415, 427 (2014)).

The second circumstance in which federal courts may grant habeas corpus relief is when the state's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). Further, absent a showing by clear and convincing evidence otherwise by a petitioner, determinations of fact "made by a [s]tate court shall be presumed to be correct." *Id.* § 2254(e)(1). To obtain relief under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (quoting 28 U.S.C. § 2254(d)(2)).

### C.    Standard for Granting Evidentiary Hearings

As noted above, absent a showing by clear and convincing evidence otherwise by a petitioner, all determinations of factual issues made by a state court must be presumed correct. 28 § 2254(e)(1). However, a petitioner may request an evidentiary hearing if they believe further factual determinations must be made to rule on a claim of a constitutional violation. *See id.* § 2254(e)(2). A court shall not hold an evidentiary hearing on the factual basis of a claim that the

13

applicant had an opportunity to develop in state court proceedings but failed to, unless the claim passes a two-pronged test. First, the claim must rely on either a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or a factual predicate that could not have been previously discovered through the exercise of due diligence." *Id.* § 2254(e)(2)(A)(i)-(ii). Second, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty." *Id.* § 2254(e)(2)(B).

## IV.    ANALYSIS

Petitioner raises five claims in his petition for habeas relief, including violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.[5] The Court will address each in turn.

### A.    Invalid Search Warrant Resulting in Search in Violation of Fourth and Fourteenth Amendments

Petitioner first alleges that the search warrant used by Investigator Cereceres to search Petitioner's residence was invalid because the affidavit filed in support included a material misrepresentation of fact. Docket No. 1, p. 4. Specifically, Petitioner argues the Affidavit in Support of the Search Warrant signed by Investigator Cereceres attested he was "a Certified Computer Forensic Examiner," which was proven false at an evidentiary hearing before trial. *Id*; Docket No. 6-5, pp. 14-15. Because the search warrant contained a false statement, Petitioner argues, the search of his residence resulting from that warrant was conducted in violation of his Fourth and Fourteenth Amendment rights and the evidence resulting from the search was

---

[5] The Fourteenth Amendment's Due Process Clause is the means by which a Fourth, Fifth or Sixth Amendment violation is enforced against a state. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Thus, although Petitioner attaches Fourteenth Amendment rights violations to each of his requests for habeas relief, the Court will analyze only Petitioner's respective underlying Fourth, Fifth or Sixth Amendment claims and not his Fourteenth Amendment claims, unless doing so would be necessary to grant or deny Petitioner's requested relief.

14

improperly admitted as evidence at trial.  Docket No. 1, p. 4.  Petitioner further asserts *Franks v. Delaware*, 438 U.S. 154 (1978) establishes precedent for this Court to grant an evidentiary hearing on this issue.  Docket No. 1, p. 4.

Respondent answers that Petitioner's Fourth Amendment claim must be dismissed pursuant to *Stone v. Powell*, which held "where the [s]tate has provided an opportunity for a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  428 U.S. 465, 494 (1976); Docket No. 8, p. 7.  Respondent asserts that Petitioner has had a "full and fair" opportunity to litigate his Fourth Amendment claim in state court in both state trial and state appeals courts, and thus the Court is barred from reviewing his claim in the present proceeding.  Docket No. 8, p. 8.

### 1.    Exhaustion

Petitioner first levied his objection to admission of any evidence obtained from Inspector Cereceres' search of Petitioner's residence in a "Motion to Suppress Fruits of Invalid Search Warrant" filed with the trial court.  Docket No. 6-1, pp. 14-20.  After an evidentiary hearing, the trial court denied petitioner's claim.  Docket No. 6-5, p. 97.  On appeal to the Tennessee Court of Criminal Appeals, Petitioner contended the trial court erred in denying his motion to suppress evidence gathered from Investigator Cereceres' search.  Docket No. 6-22, p. 1.  The Court of Criminal Appeals affirmed, holding that the evidence presented did not preponderate against the trial court's finding that Investigator Cereceres' claim that he was a certified computer forensic examiner, while inaccurate, was not a significant overstatement and was not included with any intent to deceive the magistrate judge.  Docket No. 6-24, p. 14.  Therefore, Petitioner has fully exhausted this claim in the available state proceedings.  *See* § 2254(b)(1)(A)-(B).

15

### 2. Applicable Law

Petitioner requests that the Court grant an evidentiary hearing on his claim that his Fourth Amendment rights were violated. However, there is a 'step zero' where the Court must begin before it may address this issue: that is whether federal law allows this Court to grant federal habeas corpus relief on a previously litigated claim asserting a violation of one's Fourth Amendment rights.

The clearly established federal law from the Supreme Court is: "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone,* 428 U.S. at 494. Therefore, if Petitioner has already been provided the opportunity for full and fair litigation of his claim, the Court may not grant Petitioner the relief he seeks.[6]

Full and fair consideration requires there was "an available avenue for the prisoner to present his claim to the state courts," but does not demand an inquiry into "the adequacy of the procedure actually used to resolve that particular claim." *Good v. Berghuis*, 729 F.3d 636, 639 (6th. Cir. 2013), *cert. denied*; *Stone*, 428 U.S. at 494. Thus, the Court should only consider whether

---

[6] This rule excluding federal courts from granting relief to potential victims of Constitutional rights violations may, on its face, appear contrary to the interest of justice. However, as the Sixth Circuit expressed, the rule in *Stone v. Powell* is justified by the underlying aims of federal habeas corpus:

> One, the key purpose of federal habeas corpus is to free innocent prisoners. But whether an investigation violated the Fourth Amendment has no bearing on whether the defendant is guilty. Two, exclusion is a prudential deterrent prescribed by the courts, not a personal right guaranteed by the Constitution. Any deterrence produced by an additional layer of habeas review is small, but the cost of undoing final convictions is great.

*Good v. Berghuis*, 729 F.3d 636, 637 (6th Cir. 2013) (internal citations omitted), *cert. denied*. The Court is always concerned with intrusions into the individual rights guaranteed by the Constitution, but when a prisoner has already been afforded an opportunity for "full and fair consideration" of his Fourth Amendment violation claim and the evidence from a search-and-seizure has already been cemented onto the record, the force of a Fourth Amendment violation as a justification for granting habeas corpus relief is minimized. *Stone*, 428 U.S. at 485-486.

16

Tennessee state courts provided an avenue to Petitioner to litigate his Fourth Amendment claim and nothing more. *Good*, 729 F.3d at 639.

### 3.    Analysis on the Merits

In the case at bar, Petitioner was afforded an avenue to present his claim to Tennessee state courts: the exact same avenue the Sixth Circuit approved in *Good*. *Id.* at 640. Petitioner filed a suppression motion for the results of Investigator Cereceres' search. *Compare* Docket No. 1, pp. 14-20, *with Good*, 729 F.3d at 640. After granting Petitioner a hearing, the trial court denied Petitioner's motion. *Compare* Docket No. 6-5, *with Good*, 729 F.3d at 640. Petitioner then appealed the trial court's decision to the Tennessee Court of Criminal Appeals, who rejected Petitioner's argument once more. *Compare* Docket No. 6-22, pp. 26-29, *and* Docket No. 6-24, pp. 13-15, 30, *with Good*, 729 F.3d at 640. Because this procedure sufficed for the Sixth Circuit to uphold denial of federal habeas corpus relief in *Good*, it suffices for this Court to deny Petitioner habeas corpus relief on Fourth Amendment grounds. 729 F.3d at 640.

Petitioner cites *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978), for the proposition that the Court may nonetheless grant Petitioner an evidentiary hearing. Docket No. 1, p. 4. *Franks*, however, sets a dauntingly high standard for a federal court to grant an evidentiary hearing on Fourth Amendment violation claims:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any

17

> nongovernmental informant. Finally, if these requirements are met,
> and if, when material that is the subject of the alleged falsity or
> reckless disregard is set to one side, there remains sufficient content
> in the warrant affidavit to support a finding of probable cause, no
> hearing is required. On the other hand, if the remaining content is
> insufficient, the defendant is entitled, under the Fourth and
> Fourteenth Amendments, to his hearing. Whether he will prevail at
> that hearing is, of course, another issue.

438 U.S. at 171-72, 98 S. Ct. at 2684-85.

Petitioner fails to clear all these hurdles. True, Petitioner's claim is more than a bare conclusion, as Investigator Cereceres stated on record that the statement contained in his affidavit in support of the search warrant that he was "a Certified Computer Forensic Examiner" was false. Docket No. 6-5, pp. 14-15. However, *Franks* establishes that Petitioner must do more than just demonstrate the existence of a "negligent" inclusion of a false statement; Petitioner must make an "offer of proof" that the statement was a "deliberate falsehood or of reckless disregard for the truth" or, failing that, explain their absence of such proof "satisfactorily." 438 U.S. at 171, 98 S. Ct. at 2684. Petitioner has not done so. Rather, he made bare allegations that "the statement was false" and that "as a result of the misrepresentation, the search warrant was invalid, and the search of Petitioner's residence was in violation of the Fourth and Fourteenth Amendment to the United States Constitution." Docket No. 1, p. 4. The only evidence regarding why Investigator Cereceres included the false statement on the record is that he had used "boiler plate" language for his affidavit which included that certification and that he "did not even see" the language before submitting it to the judge because of a "complete oversight" on his part. Docket No. 6-5, pp. 13, 16. Furthermore, Investigator Cereceres testified that he did not intend to submit the affidavit "in a manner to be deceitful," that he did not include the false certification on any other portions of the document where his name and credentials are printed, and that, at the time he submitted the document, he was "in training" to be a certified computer forensic examiner. *Id.* at 15, 17. Taken

together, the Court finds there is, at most, evidence of negligence on Investigator Cereceres' behalf. Petitioner has thus failed to make an offer of proof that Investigator Cereceres deliberately lied or had a reckless disregard for the truth and failed to provide a sufficient explanation as to why the Court should excuse their failure to do so. Even if the Court believed, *arguendo*, that Petitioner had made a satisfactory offer of proof, the alleged falsehood is at best a slight overstatement of Investigator Cereceres' qualifications. Thus, even if the statement were stricken entirely from the affidavit, the Court believes there would have been sufficient content remaining to support a finding of probable cause by the magistrate judge. For the foregoing reasons, the Court recommends that Petitioner's request for relief be denied on these grounds.

### B.   Statements Obtained in Violation of *Miranda v. Arizona*

Second, Petitioner thrusts that the state court improperly admitted statements gathered in violation of his *Miranda* rights. Petitioner asserts that on July 11, 2011, Investigator Cereceres instructed Petitioner's roommates to contact Petitioner and request that he return to his residence. Docket No. 1, p. 4. When Petitioner did, Investigator Cereceres then asked him if he had a computer. *Id.* at 5. Petitioner responded that he did and that his computer was in his bedroom. *Id.* Petitioner alleges that he was advised of his *Miranda* rights only after that exchange and that, therefore, all of Petitioner's statements before were obtained in violation of his Fifth and Fourteenth Amendment rights. *Id.*

Respondent parries that Petitioner's claim has already been adjudicated "on the merits" in state court, and therefore, habeas relief may only be granted if the adjudication was based on an unreasonable determination of the facts given the evidence presented to the trial court, or "resulted in a decision contrary to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." Docket No. 8, pp. 12-13 (quoting

28 U.S.C. § 2254(d)(1)).  Respondent further argues the Tennessee Criminal Court of Appeals' decision on the merits was not based on an unreasonable determination of the facts and was neither contrary to, nor an unreasonable application of, clearly established federal law.  *Id.* at 13.  Specifically, Respondent asserts that clearly established federal law dictates *Miranda* warnings are only required when a defendant is objectively in a custodial interrogation.  *Id.* at 14.  Respondent claims Petitioner's questioning never rose to the level of a custodial interrogation.  Accordingly, Respondent contends that Tennessee Criminal Court of Appeals' decision to affirm the trial court's overruling of Petitioner's objection aligns with clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented.  *Id.* at 15.

Petitioner ripostes that the Tennessee Court of Criminal Appeals did not make an actual finding of fact as to whether Petitioner was in custody at the time he made the statements in question.  Docket No. 13, p. 1.  Petitioner points out that the appellate court concluded "since…Defendant was properly advised of his *Miranda* rights and signed the waiver, there is no need to resolve the question of whether he was in custody."  *Id.* (quoting *Doria*, 2016 WL 1694120, at *14).  Petitioner reasons that, therefore, an evidentiary hearing is necessary for this Court to determine the issue of whether Petitioner was in custody at the time he made the statements in question.

### 1.    Exhaustion

Petitioner filed a Motion to Suppress Involuntary Statements with the Montgomery County Circuit Court to exclude from evidence "any oral statements that [Petitioner] may have then made" to Investigator Cereceres on July 7, 2011.  Docket No. 6-1, p. 101.  After a hearing, the trial court denied Petitioner's motion.  Docket No. 6-5, p. 97.  Petitioner appealed the trial court's denial of Petitioner's motion to suppress to the Tennessee Court of Criminal Appeals.  Docket No. 6-16.

The appeals court affirmed the trial court's ruling and held: "any answers Defendant provided before waiving his rights, if admitted in error, was harmless error."  Docket No. 6-24, p. 20.

On post-conviction appeal, Petitioner maintained that the trial court erred in denying his motion to suppress his statements to Investigator Cereceres.  Docket No. 7-1, p. 20.  As with Petitioner's motion to suppress evidence obtained during the execution of the search warrant, the Montgomery County Circuit Court found the issue was previously determined and therefore without merit, as no evidence suggested a finding that counsel were deficient in presenting the issue for determination.  *Id.* at 21.  Petitioner has fully exhausted this claim in the available state proceedings.  *See* § 2254(b)(1)(A)-(B).

## 2.  Applicable Law

Unlike with habeas consideration of Fourth Amendment claims, the exclusionary rule in *Stone* does not foreclose habeas review of a *Miranda* violation.  *Withrow v. Williams*, 507 U.S. 680, 694 (1993) (holding that none of the reasons in *Stone* for excluding habeas review on the grounds of Fourth Amendment violations applied to *Miranda* violations).  Therefore, the Court does not need to conduct any 'step zero' analysis on this claim or any of the following claims.

Understanding the circumstances that give rise to a *Miranda* violation requires first understanding the circumstances present in *Miranda* that led to the establishment of the warnings. The Supreme Court consolidated four cases and described the factual backgrounds of those cases in analyzing *Miranda*:

> [L]aw enforcement officials took the defendant into custody and interrogated him in a police station for the purpose of obtaining a confession. The police did not effectively advise him of his right to remain silent or of his right to consult with his attorney. Rather, they confronted him with an alleged accomplice who accused him of having perpetrated a murder. When the defendant denied the accusation and said "I didn't shoot Manuel, you did it," they handcuffed him and took him to an interrogation room. There, while

21

handcuffed and standing, he was questioned for four hours until he confessed. During this interrogation, the police denied his request to speak to his attorney, and they prevented his retained attorney, who had come to the police station, from consulting with him. At his trial, the State, over his objection, introduced the confession against him. We held that the statements thus made were constitutionally inadmissible.

*Miranda*, 384 U.S. at 440.

The Supreme Court clarified that an "essential ingredient" in its decision in *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964) was that the police interrogation in question had placed the defendant in so emotional a state that his "capacity for rational judgment" was impaired and the "compelling atmosphere of the in-custody interrogation, and not an independent decision on his part, caused the defendant to speak."[7] *Id.* at 465. Thus, the Supreme Court ruled that:

> [T]he prosecution may not use statements…stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been *taken into custody* or otherwise *deprived of his freedom of action in any significant way.*

*Id.* at 445 (emphasis added).

Following its decision in *Miranda*, the Supreme Court clarified that courts can only consider objective criteria concerning the circumstances of a questioning in coming to the conclusion that the questioning was "custodial," and should not delve into the interrogator's or interrogatee's subjective understanding of the setting, notwithstanding an extraordinary case.[8] *See*

---

[7] *Escobedo* is an analogous case that came before, and now undergirds, the Supreme Court's holding in *Miranda*.
[8] Chief Justice Burger conceded in *Beckwith v. United States,* "that noncustodial interrogation *might possibly* in *some* situations, by virtue of *some special circumstances*, be characterized as one where 'the behavior of…law officials was such as to overbear the petitioner's will to resist and bring about confessions not freely self-determined." 425 U.S. 347, 347-48 (emphasis added). Given the overwhelming number of caveats prefacing the exception, the Supreme Court appears to resign the exception to only be invoked in circumstances akin to substantive unconscionability from contract law. This Court need not draw any lines in the sand to rule confidently

*Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529 (1994) ("the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"); *cf. Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (refusing to apply *Miranda* where the defendant was asked to come into and then questioned in a police station because nothing restricted the defendant's freedom to depart); *Beckwith v. United States*, 425 U.S. 341, 347 (1976) (refusing to apply *Miranda* where Internal Revenue Service agents drove to the defendant's home, questioned him for hours, and asked him to furnish them with financial records from his office because the "nature" of the question was not comparable to an in-custody interrogation). Thus, the applicable "clearly established federal law" is straightforward: when a person answers a question from law enforcement, the answer is only barred from admission by the Fifth Amendment if it was given while the person was in custody or otherwise deprived of his freedom of action in some significant way and the police had not yet read the person *Miranda* warnings. 28 § U.S.C. 2254(d)(1); *see Miranda*, 348 U.S. at 444; *Beckwith*, 425 U.S. at 347; *Berkemer v. McCarty*, 468 U.S. 420, 447 (1984).[9]

### 3. Analysis on the Merits

The Tennessee Court of Criminal Appeals' decision was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court, and it was not based on an unreasonable determination of the facts based on the evidence presented.

___

that this case does not rise to such an occasion.

[9] Although not binding on this Court, it is noteworthy to add that the Seventh Circuit has analogized police custody during the execution of a search warrant to a *Terry* stop and ruled that, because *Miranda* warnings are not required in most cases where a suspect has been detained for a *Terry* stop, detention during the execution of a search warrant does not require *Miranda* warnings in most cases. *United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994).

23

The Court finds that the evidence on the record shows Petitioner interaction with Investigator Cereceres lacked a custodial nature. Investigator Cereceres arrived at Petitioner's residence with another officer while Petitioner was out of the house. Docket No. 6-5, pp. 56:3-56:5, 73:10-73:13. Investigator Cereceres testified that he would "like to have everyone there," so he told Petitioner's roommates he wanted Petitioner present. *Id.* at 56:21-56:23. One of Petitioner's roommates then called Petitioner and informed him that police officers were at his residence with a search warrant. *Id.* at 56:24-57:4. When Petitioner returned home, he was informed by the officers to sit down and given a copy of the search warrant Investigator Cereceres was there to execute. *Id.* at 72:9-72:13. There is no testimony that Petitioner was placed under arrest, restrained physically, or told where he could or could not go when he arrived. Petitioner's roommates were seated at the dining room table, monitored by the other officer, and Investigator Cereceres told Petitioner "not to discuss the matter at hand" with them, although Petitioner admits nothing actually prevented him from talking. *Id.* at 58:11-58:20, 74:16-74:19. Investigator Cereceres asked Petitioner if he had a computer, and Petitioner voluntarily responded that he did and that it was in his bedroom. *Id.* at 59:11-59:15. Petitioner then showed Investigator Cereceres where his bedroom was and the two "walked together" to the room. *Id.* at 74:13-74:20. Once the two were inside Petitioner's bedroom, Investigator Cereceres asked Petitioner if the computer in the room was his, Petitioner "opened the closet for [the investigator]." *Id.* at 76:4-76:13. Investigator Cereceres claims he advised Petitioner of his *Miranda* rights and then asked Petitioner if he had peer-to-peer sharing installed on his computer and to write written responses to a few questions. *Id.* at 62:22-63:7. Petitioner testified he could not remember being advised of his *Miranda* rights at any point. *Id.* at, 76:4-76:13.

As noted above, the record contains a conflict in the account of when Petitioner was given

*Miranda* warnings. Investigator Cereceres recalls providing Petitioner with *Miranda* warnings before asking whether he had peer-to-peer sharing on his computer. Docket No. 6-5, p. 63:4-7. According to Petitioner, Investigator Cereceres never advised him of his *Miranda* rights. *Id.* at 76:4-13. The trial court resolved the factual conflict in favor of the state, and the Tennessee Criminal Court of Appeals affirmed the trial court's finding. *Doria*, 2016 WL 1694120, at *14. Petitioner fights for an evidentiary hearing on the issue of whether Petitioner was in custody in his reply, arguing it has yet to be determined. Docket No. 13, p. 2. The Court finds no reason to grant Petitioner's request. Whether Petitioner was, as a matter of law, in custody or not is entirely immaterial if the trial court found and appeals court affirmed that Petitioner was read his *Miranda* rights. Petitioner's disagreement with Investigator Cereceres is not sufficient evidence to rise to the level of "clear and convincing" that 28 U.S.C. § 2254(e)(1) requires to rebut the presumption of correctness granted to state court determinations of fact.

The Tennessee Court of Criminal Appeals additionally came to the determination that Petitioner's answers to Investigator Cereceres' questions before being read his *Miranda* rights "if admitted in error, was harmless error." Docket No. 6-24, p. 20. The Court agrees. Petitioner's questioning by Investigator Cereceres pales in comparison to the custodial interrogation in *Miranda*. Petitioner was in his own home, which he returned to at his own risk; neither Investigator Cereceres nor the roommate who contacted Petitioner expressed that Petitioner had no choice but to return home. *Id.* at 56:16-56:25, 57:1-57:4. The only evidence in the record to suggest Petitioner's freedom was in any way restrained at the time he answered Investigator Cereceres' questions were Petitioner's subjective desire to comply with orders from authority and Investigator Cereceres' desire to question Petitioner. As to the first factor, the Supreme Court in *Yargorough v. Alvarado* held that a suspect's past experiences with authority cannot and should not be

considered by a court in determining whether a suspect was "in custody" when they were questioned by police. 541 U.S. 652, 668 (2004) (rejecting the argument that a defendant's inclination to remain and answer questions in an interrogation due to his age and prior history with law enforcement should be used as evidence in determining whether he was in custody for *Miranda* purposes). Petitioner's apprehension towards walking away from an officer at his home with a search warrant on account of his military experience, while understandable, was properly disregarded by the state court. As to the second factor, "a policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442. Investigator Cereceres' desire to have the defendant present and ask him questions where he felt most comfortable thus should not have been considered by the state court, since these desires were never expressed by the investigator to Petitioner, only to Petitioner's roommates. Docket No. 6-5, p. 55:16-55:23. The Court finds the state court's holding that Defendant's answers, if admitted in error, were harmless, aligned with and reasonably applied federal law and contained no unreasonable determinations of fact in light of the evidence presented.[10] Accordingly, the undersigned recommends that Petitioner's request for federal habeas corpus relief on these grounds be denied.

### C.    Improper Admission of Hearsay Statements

Third, Petitioner contends his right under the Sixth Amendment's Confrontation Clause was violated when the trial court improperly admitted hearsay statements onto the record. Petitioner points to Investigator Cereceres' testimony at trial recalling that "when one of the parties

---

[10] The Court finds Petitioner's answers were not admitted in error whatsoever and thus will not delve into the second stage of analysis to determine whether the state court's decision that any error was harmless was an unreasonable application of, or contrary to, established federal law.

spoke, he stated 'I wouldn't do that, that's got to be [*expletive omitted*] Doria,'" and argues that the Tennessee Court of Criminal Appeals violated the holding in *Crawford v. Washington*, 541 U.S. 36 (2004) by admitting the statement over Petitioner's objection. Docket No. 1, pp. 5-6; Docket No. 6-7, p. 54:6-54:7.

Respondent counters that the Confrontation Clause was not violated, and that Petitioner's Sixth Amendment rights were left unscathed by the trial court. Docket No. 8, p. 20. Respondent argues that the Supreme Court has ruled, and even reiterated in *Crawford*, that the Confrontation Clause does not permit the use of statements by declarants who appear at trial and who defendant has the opportunity to cross-examine. *Id.* at 18; *California v. Green*, 399 U.S. 149, 162 (1970). Respondent concludes that because Investigator Cereceres referred to the declarant as a "he," one of Petitioner's male roommates must have made the statement, and because the State called both of Petitioner's male roommates at trial following Investigator Cereceres' testimony, the declarant necessarily appeared at trial for Petitioner to cross-examine. Docket No. 8, p. 20.

### 1. Exhaustion

At trial, Petitioner raised a hearsay objection once Investigator Cereceres began responding to the question on redirect examination: "Did any of those other people say something while you were there, did you overhear that?" Docket No. 6-7, p. 53:20-53:22. The trial judge overruled Petitioner's objection and allowed Investigator Cereceres to testify to the statement in contention. *Id.* at 54:1-54:7. Petitioner argued to the Tennessee Court of Criminal Appeals that the resulting testimony was admitted in violation of the state and federal Confrontation Clauses, constituting reversible error. Docket No. 6-22, pp. 42-47. The court disagreed and found that, while the trial court had admitted testimonial hearsay, the admission did not amount to a violation of the Confrontation Clause, and accordingly, Petitioner was not entitled to relief on the issue. Docket

No. 6-24, p. 25. Petitioner has thus fully exhausted this claim in the available state proceedings. *See* § 2254(b)(1)(A)-(B).

## 2. Applicable Law

The Supreme Court has interpreted the Sixth Amendment's language that "the accused shall enjoy the right…to be confronted by the witnesses against him" as barring admission of testimonial hearsay unless the declarant is unavailable at trial and the defendant had the opportunity to cross-examine prior to the statement being offered at trial. U.S. Const. amend. VI; *Crawford*, 541 U.S. at 68. The admission of a testimonial statement that does not conform to these requirements is "alone…sufficient to make out a violation of the Sixth Amendment." *Crawford*, 541 U.S. at 68. Because *Crawford* carved out a general rule for admitting and excluding testimonial statements without sculpting a specific definition for what constitutes testimonial statements, a question naturally arose: what does it mean for a statement to be "testimonial"? The Supreme Court answered with the "primary purpose" test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006).

Five years later, the "primary purpose" test was clarified such that courts must, as is often required, consider "all relevant circumstances" and determine whether the purpose of the conversation was to resolve an ongoing emergency or to "create an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 369 (2011) (holding that statements by a dying victim about his assailant were nontestimonial because the conversation was objectively aimed at

28

stopping an ongoing emergency and not establishing facts for prosecution). The latter is testimonial and may invoke the Confrontation Clause; the former is not and may only invoke objection under state and federal rules of evidence. *Id.* at 357-59.

After the court has determined the statement was testimonial, the court must also determine whether the declarant is available to testify and, if not, whether the defendant had the opportunity to cross examine the declarant prior to trial. *See Green*, 399 U.S. at 161. If the declarant is available and testifying at trial, then the inquiry ends, and the Confrontation Clause has not been violated. *See Crawford*, 541 U.S. at 68. The accused does not need the opportunity for prior examination; they have the opportunity for contemporaneous cross examination. If the declarant is unavailable, the statement may only be admitted if the defendant had the opportunity to cross examine the declarant. *Id.*

### 3. Analysis on the Merits

On cross examination, Petitioner and Investigator Cereceres had the following exchange:

> Q:    [T]here is not going to be a single witness come [*sic*] in here and say that they observed Mr. Doria physically downloading any of this stuff?
>
> A:    That's correct.
>
> Q:    Nobody that would come in here and testify that they heard him talk about this stuff, correct?
>
> A:    I have no idea about that. No witnesses, no nothing.

Docket No. 6-7, p. 52:12-52:16.

The State then followed up with Investigator Cereceres on redirect examination:

> Q:    [Y]ou were also asked just a couple of months [*sic*] ago about whether or not…any of the other individuals in the home said anything about seeing Mr. Doria watching or looking at child pornography, do you recall that question?

> A:      Yes, I recall that question.
>
> Q:      Did any of those other people say something while you were there, did you overhear that?
>
> A:      The only thing that I can–
>
> > …
>
> A:      The only thing that was relayed by one of the parties says…when one of the parties spoke, he stated I wouldn't do that, that's got to be [*expletive omitted*] Doria.

*Id.* at 51:14-52:7.

Petitioner immediately returned for recross examination and asked:

> Q:      Do you recall the individual that said that?
>
> A:      Negative, I'm sorry, sir, that – I do not.

*Id.* at 51:13-51:16.

The Court's first inquiry is into whether the statement in question, "I wouldn't do that, that's got to be [*expletive omitted*] Doria" is testimonial. *Id.* at 51:14-52:7. The Tennessee Court of Criminal Appeals found it was, and its determination both falls in line with the Supreme Court's established federal law and is reasonable in light of the facts in evidence. *Doria,* 2016 WL 1694120 at *17. The statement was made while Investigator Cereceres and another officer were executing their search warrant in Petitioner's residence while no emergency was ongoing. The very nature of Investigator Cereceres' visit was to gather information to use at trial against one of the members of that house, depending on the result of the search.

The next step is determining whether the declarant was available. Due to the unique circumstances of this case, the answer is not obvious. Respondent argues deductively that because Investigator Cereceres said a "he" made the statement and there were only two males parties present at the residence when the statement was made, the declarant must be one of those two

30

males. Docket No. 8, pp. 20-21. Therefore, because both men testified at trial after Investigator Cereceres' examination, Petitioner necessarily had the opportunity to cross examine the declarant of the statement, even if the exact declarant is unknown. *Id.* Petitioner replies that one of Respondent's cases in a three-case string citation[11] is not sufficiently analogous to support its proposed use and fails to otherwise address the substance of, or other support for, Respondent's proposition that "the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."[12] Docket No. 13, pp. 2-3; Docket No. 8, p. 18. However, *Crawford* and *Green*, the first two cases in Respondent's citation to authority, are alone sufficient to support the proposition. Thus, even if the Court agrees that Petitioner is correct and declines to consider *Mayberry* as support for Respondent's argument, Petitioner has effectively taken away the cat's tail but neither its claws nor its fangs. *Crawford*, as discussed above, establishes that confrontation

---

[11] Petitioner criticizes Respondent's use of *United States v. Mayberry*, 504 F.3d 506 (6th Cir. 2008), which Respondent places after a '*See also*' signal at the end of their primary citation to *Crawford* and *Green*.

[12] Petitioner concludes his reply to Respondent's argument against Petitioner's third claim by saying: "Being allowed to later address the issue with a possible declarant does not cure the error." This Court contends that the Supreme Court would disagree:

> It may be true that a jury would be in a better position to evaluate the truth of the prior statement if it could somehow be whisked magically back in time to witness a grueling cross-examination of the declarant as he first gives his statement. But the question as we see it must be not whether one can somehow imagine the jury in 'a better position,' but whether subsequent cross-examination at the defendant's trial will still afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. On that issue, neither evidence nor reason convinces us that contemporaneous cross-examination before the ultimate trier of fact is so much more effective than subsequent examination that it must be made the touchstone of the Confrontation Clause.

*Green*, 399 U.S. 160-161.

The Supreme Court's ruling in *Green* concerned whether admission of a declarant-witness' prior statement could violate the Confrontation Clause, but its reasoning is well-suited to the case at hand. Petitioner had every opportunity to ask the male roommates who testified whether they made that statement. If either answered yes, then the Petitioner is not prejudiced by the statement's admission under Investigator Cereceres. If both answered no, then the credibility of the statement, the roommates, and now Investigator Cereceres' entire testimony are undermined. Petitioner took a gamble by solely attacking the credibility of the statement on recross examination of Investigator Cereceres, and seemingly lost. He may not now, with the benefit of hindsight, ask the Court to repair the damage.

is "the only indicium of reliability sufficient to satisfy constitutional demands" to allow the admission of testimonial hearsay statements. 541 U.S. at 68-69. *Green* also makes a substantial contribution to Respondent's argument, as it holds that "there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." 399 U.S. at 158. Both potential declarants of the alleged statement in this case testified as witnesses and were subject to full and effective cross examination. Docket No. 6-7, pp. 55:9-83:21.

While the Court believes there is a colorable legal argument that Investigator Cereceres' unclear testimony about the identity of the declarant strips some ability for Petitioner to have adequately confronted the declarant, the Court is nevertheless unable to grant Petitioner relief on these grounds. The standard set forth by 28 U.S.C. § 2254(d) precludes this Court from granting Petitioner relief on the grounds that an argument in favor of Petitioner holds water. The Court may only grant relief if the decision by the state court was "contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2). An entertainable argument is not enough. *See id.* The same goes for the concern over whether Investigator Cereceres' having said "he stated" despite agreeing on recross examination that he did not recall the declarant is sufficient evidence for the state court to find the declarant was present at trial; that determination is debatable, but not unreasonable. Therefore, because the state court's decision was neither contrary to, nor an unreasonable application of, federal law clearly established by the Supreme Court, the Court recommends Petitioner's request for relief on these grounds be denied.

### D. Improper Admission of Prejudicial Evidence

Fourth, Petitioner contends that the State violated his rights under the Fifth, Sixth, and Fourteenth Amendments by failing to redact portions of a supplemental report by Detective Levasseur before admitting it into evidence. Docket No. 1, p. 6. Petitioner argues that Detective Levasseur's report contained information that pornography involving rape and bestiality, both of which the trial court should have excluded after granting Petitioner's motion in limine to exclude such evidence. *Id*; Docket No. 6-22, p. 49. Petitioner asserts the Tennessee Court of Criminal Appeals correctly found the trial court's admission of the report without redacting that information was error, but wrongly decided that Petitioner was not prejudiced by the error under the standards pronounced in *O'Neal v. McAninch*, 513 U.S. 432 (1995). Docket No. 1, p. 6.

Respondent answers with three arguments. First, Respondent argues that Petitioner's claim lacks cognizability because it only makes "cursory allegations to due process and equal protections generally" without advancing any federal law in support. Docket No. 8, p. 21. Second, Respondent adds that Petitioner's claim is procedurally defaulted because Petitioner presented this claim to state courts on evidentiary, not constitutional grounds, and as such Petitioner did not exhaust his claim in state court, and this Court is barred from reviewing it. *Id.* at 22. Finally, Respondent advances that even if the claim were cognizable and properly exhausted, there was no finding of constitutional error, as opposed to evidentiary error, and certainly not error that resulted in actual prejudice to Petitioner. *Id.* at 22-23.

### 1. Exhaustion

Petitioner filed a motion in limine to exclude evidence that Petitioner possessed or visited a website that hosted images and videos of bestiality pornography pursuant to Tennessee Rules of Evidence 401, 403 and 404. Docket No. 6-2, pp. 5-7. The trial court granted Petitioner's motion. Docket No. 6-24, p. 25. At trial, Petitioner objected to the admission of Detective Levasseur's

expert report as a whole and the trial court allowed the report into evidence over the objection. Docket No. 6-7, pp. 98:8-100:9. On appeal to the Tennessee Court of Criminal Appeals, Petitioner argued that he was entitled to a new trial because the State failed to redact all mentions of bestiality and rape pornography, which were irrelevant and unfairly prejudiced him. Docket No. 6-22, pp. 47-49. The Tennessee Court of Criminal Appeals agreed with Petitioner that the trial court erred in admitting the evidence, but under Tenn. R. App. P. 36(b), the error had not "more probably than not affected the judgment" and found Petitioner was not entitled to relief on the issue. Docket No. 6-24, p. 26. Petitioner did not raise the issue in his request for post-conviction relief. Docket No. 7-1, pp. 5-8.

As Respondent points out, "exhaustion of state remedies requires that petitioners fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal citations omitted) (internal quotation marks omitted). The Supreme Court found a claim analogous to Petitioner's to have not met the bar of fair presentation:

> In this case respondent argued on appeal that the trial court's instruction on the element of malice was "erroneous." He offered no support for this conclusion other than a citation to, and three excerpts from, People v. Martin, supra-a case which held that, under Michigan law, malice should not be implied from the fact that a weapon is used. Not surprisingly, the Michigan Court of Appeals interpreted respondent's claim as being predicated on the state-law rule of Martin, and analyzed it accordingly.
>
> The United States Court of Appeals concluded that "the due process ramifications" of respondent's argument to the Michigan court "were self-evident," and that respondent's "reliance on Martin was sufficient to present the state courts with the substance of his due process challenge to the malice instruction for habeas exhaustion purposes." We disagree.

*Anderson v. Harless*, 459 U.S. 4, 7 (1982).

As with the respondent's claim in *Anderson* that argued the trial court erred, Petitioner appealed to the Tennessee Court of Criminal Appeals on the grounds that the State violated the pretrial ruling and "the error was not harmless." *Id.*; Docket No. 6-22, p. 47. Also similar to *Anderson* is the Petitioner's citation to state law violations. Petitioner claimed in his appeal that evidence of bestiality pornography was "impermissible bad act evidence under Tenn. R. Evid. 404(b)" and that reference to rape pornography had no probative value, citing to Tennessee criminal cases and rules of evidence. *Anderson*, 459 U.S. at 7; Docket No. 6-22, p. 49. Unsurprisingly, the Tennessee Court of Criminal Appeals analyzed Petitioner's claim under state law and rules of evidence. Docket No. 6-24, pp. 26-27. Petitioner's failure is "especially pronounced" because he did raise constitutional and federal law issues to the state court on his other claims of error for denying his motions to suppress and violation of the Confrontation Clause. *Duncan*, 513 U.S. at 365; Docket No. 6-22, pp. 1, 15, 23. This demonstrates to the Court that Petitioner had the capacity and foresight to raise constitutional issues and makes it difficult to excuse his failure to do so for this claim. For the foregoing reasons, the Court finds that Petitioner has not exhausted his constitutional claim in state court. Therefore, 28 U.S.C. § 2254(b)(1) bars the Court from granting federal habeas relief. In any event, the Court cannot conclude that the state court finding of harmless error was objectively unreasonable, given that Petitioner testified that he used the objected-to term, "bestiality," in his computer searches. Docket No. 6-12, p. 3; Docket No. 6-1, pp. 63:2-63:10.

**E.      Ineffective Assistance of Counsel During Pretrial and Trial**

Finally, Petitioner claims his Sixth and Fourteenth Amendment rights were violated when he did not receive the effective assistance of counsel during either his pretrial or trial. Docket No. 1, p. 7. Petitioner argues that his pretrial counsel were ineffective because they forced Petitioner

to participate in a televised press conference, over his objection, claiming it would "get the jury on their side."[13]  Docket No. 1, p. 8.  Petitioner claims the televised interview soured relations with the State of Tennessee, leading to Petitioner's case coming under harsher scrutiny and preventing Petitioner from receiving a plea deal.  *Id.*  Petitioner additionally argues that Chris Clark, Petitioner's trial counsel, instructed Petitioner's mother, Ms. Henrion to arrive to testify on the third day of trial and failed to move for a continuance once Mr. Clerk realized proof would close on the second day.  Docket No. 1, p. 7.  Petitioner avers that Mr. Clark's failure resulted in Ms. Henrion being unable to testify and present evidence at trial that Petitioner was not in the country when some of the downloads of child pornography occurred.  *Id.*  Petitioner argues that both his pretrial and trial counsel therefore were ineffective and that he was deprived of his Sixth Amendment rights under the legal standard set forth by *Strickland v. Washington*, 466 U.S. 668 (1984).  Docket No. 1, p. 9.

Respondent asserts the trial court's determination should stand because it was neither contrary to, nor an unreasonable application of, law established by the Supreme Court and not an unreasonable determination of the facts in light of the evidence presented.  Docket No. 8, p. 33. Respondent rests his argument against Petitioner's claim against his pretrial counsel heavily on Petitioner's failure to show any evidence that the televised press conference affected either the State of Tennessee or the jury.  *Id.*  Respondent also rebuts that Petitioner's claim against his trial counsel fails because the exclusion of Ms. Henrion's testimony did not actually prejudice Petitioner's defense.  *Id.* at 29-31.  Respondent argues each of the facts Ms. Henrion would have testified to were either irrelevant, immaterial, or duplicative.  *Id.*

---

[13] Petitioner's attorneys at the time were Fletcher Long and John Herbison.  The Court will not delve into the career history of these attorneys but will note that Fletcher Long was disbarred effective November 15, 2017.  *Long v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 435 S.W.3d 174, 177 (Tenn. 2014).

Petitioner's reply is nothing more than a summarization of his arguments in his Petition. Docket No. 13, pp. 3-4.

### 1.    Exhaustion

Petitioner filed a "Petition for Post Conviction Relief" on January 20, 2017, raising denial of effective assistance of counsel at trial and pretrial as his grounds for the petition. Docket No. 7-1, pp. 3-9. On August 15, 2017, the Montgomery County Circuit Court held a post-conviction relief hearing. Docket No. 7-2. Shortly after, on September 12, 2017, the Montgomery County Circuit Court denied the Petition. Docket No. 7-1, p. 12. Petitioner appealed the decision to the Tennessee Court of Criminal Appeals. Docket Nos. 7-6, 7-7. On December 12, 2017, the Tennessee Court of Criminal Appeals filed an order affirming the lower court's judgment. Docket Nos. 7-10, 7-11. Petitioner applied for discretionary review by the Tennessee Supreme Court under Tenn. R. App. P. 11(a), which the court denied on February 2, 2019. Therefore, Petitioner has fully exhausted this claim in the available state proceedings. *See* § 2254(b)(1)(A)-(B).

### 2.    Applicable Law

The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). *See generally Gideon v. Wainwright*, 372 U.S. 335, 342 (1963). To substantiate a claim that his counsel was ineffective, a petitioner must prove: (1) that his "counsel's performance was deficient" and (2) that his counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* In a court's application of the *Strickland* standard, the court need not analyze one prong before the other nor is it necessary "to address both components of the

inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

To establish that a petitioner's counsel was deficient, it must be shown that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed to the [petitioner] by the Sixth Amendment." *Id.* at 687. In other words, counsel's performance must have fallen "'below an objective standard of reasonableness.'" *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) (quoting *Strickland*, 466 U.S. at 688). The standard for measuring performance under the deficiency prong is "'reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). Measuring counsel's performance requires deference to be given to counsel's decisions, including "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Accordingly, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Further, proving prejudice to the defense "requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, a petitioner must show "by 'a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different.'" *Sylvester v. United States*, 868 F.3d 503, 511 (6th Cir. 2017) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In making this showing, "it is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

A petitioner does not have to demonstrate prejudice under *Strickland* in three categories of error in which prejudice is presumed: (1) when the right to counsel is denied; (2) when the state interferes "with counsel's assistance;" and (3) when "counsel is burdened by an actual conflict of interest" so long as the petitioner shows "the conflict adversely affected his counsel's performance." *Smith v. Robbins*, 528 U.S. 259, 287 (2000) (citations omitted). Under these circumstances, "prejudice . . . is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland*, 466 U.S. at 692.

### 3.     Analysis on the Merits

#### i.          Assistance of Pretrial Counsel

In the present case, Petitioner has not demonstrated that the state courts unreasonably applied or contradicted clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). The Tennessee Court of Criminal Appeals found that Petitioner's claim of ineffective assistance of pretrial counsel failed because Petitioner did not demonstrate how the televised interview actually prejudiced Petitioner. Docket No. 7-10, p. 7. Based on the evidence presented at the post-conviction hearing, this Court finds that is not an unreasonable determination. It is important to note at the outset that Petitioner was convicted by a jury, none of whom stated that they had either seen Petitioner's interview or even heard about his case on television. Docket No. 7-2, p. 35:11-35:19. Petitioner himself did not present a copy of the interview as evidence. Docket No. 7-10, p. 7. Petitioner also testified at trial that he downloaded child pornography, albeit accidentally, which would largely negate any potential prejudice the interview would create. *Id.* That said, Petitioner's primary argument in support of his claim of prejudice is less that the interview impacted his trial and more that it created animosity that jaded the State of Tennessee and led to a tougher prosecution against him. *Id*; Docket No. 1, p. 8. Petitioner developed the evidence for

that claim through the testimony of Chris Clark, Petitioner's trial counsel, who testified at the post-conviction hearing that, *inter alia*, he felt the press conference "hurt the case … tremendously." Docket No. 7-2, p. 68:2-68:7.  The state courts remained unconvinced, finding and affirming that Petitioner failed to establish either prong of *Strickland* and denying him relief on the basis of his pretrial counsel's actions.  Docket No. 7-1, p. 22; Docket No. 7-10, p. 7.

The Court finds the state courts' holdings are neither contrary to, nor an unreasonable application of, clearly established federal law, and were not unreasonable determinations in light of the facts presented at the post-conviction hearing.  As the Montgomery Court of Criminal Appeals stated:

> While a press conference might not have been the most beneficial action in retrospect, there is no evidence showing that it had any effect on the prosecution.  There is no constitutional or statutory right which requires the State to make a settlement offer.  Also, there is no proof that the press conference affected the outcome of the trial.

Docket No. 7-2, pp. 22-23.

Petitioner had an opportunity to develop his claim in state court proceedings and, as the state court stated, failed to provide more than attenuated circumstantial evidence that the televised press conference affected the prosecution's investigation into Petitioner's case.  The most Petitioner could muster was that it was Mr. Clark's "understanding" that Detective Levasseur conducted a more thorough investigation of Petitioner's computer activity after the press conference.  Docket No. 7-2, pp. 65-66.  Even if the Court accepted this as true, a court could still reasonably determine that the press conference did not result in actual prejudice because there is no evidence that Detective Levasseur, or some other expert, would not have otherwise uncovered the information brought against Petitioner.  Moreover, Mr. Clark testified his own emails to the prosecution "frustrat[ed] him to no end" and that the press conference only "may have been a

40

factor in it." *Id.* at 69. Most importantly, Petitioner admitted there were no discussions between his attorneys and the District Attorney prior to the interview, which suggests the District Attorney never considered the plea deal to begin with and leaving the Court without any reference to gauge whether the prosecution acted differently post-conference. Docket No. 7-2, pp. 18:22-19:1. Without any evidence of how the State reacted to the press conference beyond conjecture by Petitioner's trial counsel, a reasonable finder of fact could determine that Petitioner had not defeated the presumption of competency granted by *Strickland* and that Petitioner was not prejudiced. *Strickland*, 466 U.S. at 689. The Court thus finds the state courts did not come to an unreasonable determination of fact or application of law in light of the evidence presented. The undersigned recommends Petitioner's request for relief on these grounds be denied.

### ii. Assistance of Trial Counsel

Petitioner has additionally not demonstrated that the state courts' decision to deny relief on the grounds of ineffective assistance of trial counsel is contrary to, or an unreasonable application of, clearly established federal law. Petitioner simply overstates the impact Ms. Henrion's testimony could be reasonably expected to have had on the jury if she had testified. At the post-conviction hearing, Ms. Henrion explained that she would have testified that Petitioner had his laptop with him when he was home on leave in May and June and that the State's timeline of when Petitioner's computer downloaded illegal pornography from the IP address at his Tennessee residence conflicted with the date he moved into his apartment. Docket No. 7-2, pp. 48:17-49:7, 51:4-51:10, 53:2-53:20. Each of these issues were raised at trial despite Ms. Henrion's absense, and the additional documentation Ms. Henrion provided to support these claims is unremarkable.

With regard to Petitioner having his laptop while on leave from May to June, Petitioner testified at trial:

Q:      When you returned from Afghanistan, did you take a leave?

A:      Yes sir, I did.

Q:      And when did you take leave?

A:      I would say middle of May until the beginning of June.

Q:      Do you have any documentation that you took leave during that time?

A:      I have my bank statement, whatever the military gave me.

Q:      Where was your computer when you went to New Jersey in May, mid May?

A:      I brought it with me.

…

Q: When did you return?

A: I would say…I came back towards like the middle of June.

Docket No. 6-8, pp. 61:6-61:18, 62:13-62:16.

With respect to Ms. Henrion's potential testimony about the timeline issue, the Court finds

three problems. First, Mr. Clark's decision to not request an extension to provide Ms. Henrion the

opportunity to testify appears to have been a strategic decision and did not occur from any malice

or lack of preparation. Mr. Clark testified that he felt the timeline "wasn't that strong of testimony"

that "wouldn't have made any difference whatsoever." Docket No. 7-2, p. 78:1-78:20. As

*Strickland* provides, the Court is to presume that trial strategy planned by counsel who spent far

more time examining and planning for a case is sound. 466 U.S. at 689. Second, testimony that

Petitioner was not moved into the apartment in question and could thus not be connected to the IP

address associated with the download of child pornography at some of the reported times lacks

much weight when Petitioner admitted on the stand that he downloaded child pornography.

42

Docket No. 6-8, p. 63:14-63:21. Third, there was no evidence presented by Ms. Henrion at the post-conviction hearing regarding the issue about which Petitioner himself could not have testified. Docket No. 7-2, pp. 48:1-50:19. For these reasons, the Court finds the state courts' decisions that Petitioner's trial counsel were neither deficient nor prejudicial is neither contrary to, nor an unreasonable application of, clearly established federal law. The undersigned accordingly recommends Petitioner's request for federal habeas relief on this claim be denied.

## V.    CONCLUSION

Detention is a matter this Court takes with the utmost seriousness. While granting all due deference to the decisions of the state courts, this Court has thoroughly scrutinized the entire record of Petitioner's proceedings. After careful review, and for the reasons discussed above, the undersigned recommends that habeas corpus relief be **DENIED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute waiver of further appeal of this Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**

43